[Cite as *State v. Stanley*, 2021-Ohio-108.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2020-L-065** |
| DAVID C. STANLEY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2019 CR 000850.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Melissa A. Blake*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, David C. Stanley, appeals his sentences for various felony charges. For the following reasons, we affirm the sentences imposed.

{¶2} On February 18, 2020, Stanley entered a Written Plea of Guilty to the following charges: Attempted Murder (Count 1), a felony of the first degree in violation of R.C. 2903.02(A) and 2923.02; Grand Theft of a Motor Vehicle (Count 6), a felony of the fourth degree in violation of R.C. 2913.02(A)(1); Aggravated Robbery (Count 7), a felony of the first degree in violation of R.C. 2911.01(A)(1); Tampering with Evidence (Count 11),

a felony of the third degree in violation of R.C. 2921.12(A)(1); and Tampering with Evidence (Count 12), a felony of the third degree in violation of R.C. 2921.12(A)(1).

{¶3} At the change of plea hearing, the State proffered the following factual basis for the charges:

> The defendant David Stanley, co-defendants Michael Joyce and Patrick Spurier (sp), * * * on July 31st, 2019 * * * were at Arby's in Painesville, Lake County, Ohio. Throughout the course of this investigation the defendant was interviewed and stated that Spurier had a knife on his person and made a comment about going to a friend's house. That friend was the victim, Christopher Martin's apartment located at 205 Mentor Avenue in the city of Painesville (sic). The plan was to go over to the apartment of Mr. Martin to hang out. Mr. Spurier mentioned something about killing the victim. However, when the detective * * * was speaking to the defendant, he clarified that he meant knock him out in order for Spurier to try and attempt to get a vehicle back. The vehicle in question, the 2008 Chevy Impala, belonged to the victim Christopher Martin, at no point belonged to Spurier, was never sold to Spurier, although he was making representations as if he was the rightful owner.
>
> All three co-defendants went to Mr. Martin's apartment, in addition to Rebecca Spladeck (sp), they walked from Arby's and all three co-defendants entered into the second-floor apartment and Ms. Spladeck stayed outside the apartment on the ground floor. All three were inside the victim's living room for a period of time. The victim had received several phone calls and would take these phone calls outside on the front porch, which is right off the living room. After one phone call, or while the victim is on a phone call outside Mr. Spurier told the defendant to knock out the victim with a twenty-pound handheld dumbbell weight that was in the living room. The defendant stood in the corner of the living room behind the patio door and Mr. Joyce and Mr. Spurier were seated on the couch. The victim re-entered the apartment after his phone call, and the defendant made a comment to the victim that he was going to have to knock him out. In the interview with the defendant, it was determined that this statement was made in relation to a flashback that the defendant was having in regards to a relationship that he has had, or not had with his father throughout his life that has been difficult for him.
>
> At this point the victim stood up and told the defendant that he had to leave, and he was pushed back onto the couch. The defendant held the victim on the couch for approximately two seconds. The victim started to yell, at which point Spurier used the knife in his hand

2

* * * and began to stab the victim repeatedly. Mr. Joyce held a pillow over the victim's face to keep him from screaming, to try and block the noise and to attempt to suffocate him. The knife used by Mr. Spurier, the handle was wrapped in a blue bandana. The victim was able to move from the couch area to a few feet onto the floor, trying to get away from the three co-defendants. This is a small area. He was begging for his life, asking them to stop. The victim was stabbed several times in his arms, abdomen, and from the middle of his neck towards the back of his neck under his ear, about fifteen to twenty centimeters. The defendant struck the victim twice in the head and chest area with the twenty-pound dumbbell weight. In the interview with the defendant he stated he thought he killed the victim.

Mr. Stanley and Mr. Joyce ran out of the victim's apartment. Mr. Spurier followed shortly, and orders everyone inside the victim's vehicle. Mr. Spurier did have the keys to the vehicle in his possession and ordered everyone inside. The car keys were taken from Mr. Martin's person, he did not have permission to take the vehicle. All three co-defendants and Ms. Spladeck get inside Mr. Martin's vehicle. Mr. Spurier is driving, the defendant is in the front passenger seat, and they drive down Mentor Avenue and they see police cars. They determine that they need to ditch the blue bandana because of possible blood or DNA evidence on it. The bandana's removed from the knife and thrown behind the dumpster in Walgreens off of Richmond Street, which is eventually located by officers. They re-enter the vehicle, Mr. Spurier continues driving, and the Defendant is also in the front seat. The group decides that they need to get rid of the knife for the same reason, possible DNA or blood evidence on it. And the defendant directs Mr. Spurier to the area towards Grand River into Mentor, and into the area of Mentor Headlands where eventually they reach Veteran's Park in the city of Mentor. The defendant reached under his seat with his hoodie to grab the knife, as he does not want to try and get any DNA on this knife, and throws the knife out the window at Veteran's Park, which was ultimately located by a Metro Parks grounds crew.

{¶4} On April 17, 2020, the sentencing hearing was held. For Attempted Murder (Count 1), Stanley received a minimum term of eleven years to a maximum term of sixteen years and six months in prison; for Grand Theft of a Motor Vehicle (Count 6), he received eighteen months in prison; for Aggravated Robbery (Count 7), he received eleven years in prison; and for each count of Tampering with Evidence (Counts 11 and 12), he received thirty months in prison. The sentences for Counts 1, 6, and 7 were ordered to be served

3

consecutively with each other and concurrently with Counts 11 and 12 for a stated aggregate minimum term of twenty-three years and six months to an aggregate maximum term of twenty-nine years.

{¶5}    On April 20, 2020, the Judgment Entry of Sentence was issued.

{¶6}    On May 20, 2020, Stanley filed a Notice of Appeal.  On appeal, he raises the following assignments of error:

{¶7}    "[1.] The defendant-appellant's indeterminate prison sentence of eleven to sixteen and one-half years on Count One, which was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, must be reversed as the Reagan Tokes Act unconstitutionally violates the doctrine of separation of powers."

{¶8}    "[2.] The defendant-appellant's indeterminate prison sentence of eleven to sixteen and one-half years on Count One, which was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, violates his constitutional right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 5 of the Ohio Constitution."

{¶9}    "[3.] The defendant-appellant's indeterminate prison sentence of eleven to sixteen and one-half years on Count One, which was ordered pursuant to the 'Reagan Tokes Act,' aka Senate Bill 201, violates his constitutional rights to fair trial and due process as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5 & 10 of the Ohio Constitution."

{¶10}    "[4.] The trial court erred to the prejudice of the defendant-appellant when it failed to merge his conviction on Count Six, with Count Seven and when it failed to merge his conviction on Count Seven with Count One, in violation of his rights against double jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution

4

and Article I, Section 10 of the Ohio Constitution.

{¶11} "[5.] The trial court erred by sentencing the defendant-appellant to individual, maximum prison terms of eleven to sixteen and one-half years on Count One, eighteen months on Count Six, eleven years on Count Seven; and individual thirty-month prison terms on both Counts Eleven and Twelve, as the trial court's findings with respect to R.C. 2929.11 and 2929.12 were unsupported by the record and thus contrary to law."

{¶12} Stanley's first three assignments of error challenge the constitutionality of Senate Bill 201 otherwise known as the Reagan Tokes Act, effective for crimes committed on or after March 22, 2019. Pursuant to the new law, Stanley received indefinite prison terms with stated minimum terms of eleven years for two qualifying first-degree felonies, Attempted Murder and Aggravated Robbery, to be served consecutively with each other and with a definite eighteen-month term for Grand Theft. R.C. 2929.14(A)(1)(a) and (3)(b). This yields an aggregate minimum term of twenty-three and a half years and a maximum term of twenty-nine years. R.C. 2929.144(B)(2). Under the indefinite sentencing law, "there shall be a presumption that the person shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(B). This presumption may be rebutted by the department of rehabilitation and correction if it determines, at a hearing, that the offender has committed certain institutional rule infractions and continues to pose a threat to society, the offender has been placed in extended restrictive housing within a year of the hearing, or the offender is classified as a security level three or higher. R.C. 2967.271(C).

{¶13} Before considering the merits of Stanley's arguments, we must first address the State's claim that, by not raising the issue of the constitutionality of the Reagan Tokes

Act in the trial court, he has forfeited the right to raise the arguments for the first time on appeal.

{¶14} "Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus. The *Awan* waiver doctrine, however, "is discretionary." *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus. "Even where waiver is clear, [an appellate] court reserves the right to consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it." *Id.*; *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16 ("this court has discretion to consider a forfeited constitutional challenge to a statute * * * [where] but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice").

{¶15} This court has recently considered a constitutional challenge to the Reagan Tokes Act in similar circumstances. In *State v. Ferguson*, 11th Dist. Lake No. 2020-L-031, 2020-Ohio-5578, "appellant did not object to the constitutionality of the Reagan Tokes Act before the trial court" and, thereby, failed to properly preserve the issue for review. *Id.* at ¶ 13. Furthermore, in light of the strong presumption of constitutionality that must accorded legislative enactments, this court "decline[d] to exercise our discretion to address the constitutional challenge for the first time on appeal." *Id.* As Stanley has similarly failed to challenge the constitutionality of the Act before the lower court and has not made a demonstration of plain error, this court declines to

6

consider the arguments raised for the first time on appeal.

{¶16} The first three assignments of error are without merit.

{¶17} In the fourth assignment of error, Stanley claims the trial court erred by failing to merge certain offenses at sentencing.

{¶18} Ohio's multiple counts statute or allied offenses of similar import statute provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25; *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of the syllabus ("a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus").

{¶19} "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *Ruff* at paragraph one of the syllabus. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the

syllabus.

{¶20} "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶21} Stanley's first argument is that Grand Theft of a Motor Vehicle (Count 6) and Aggravated Robbery (Count 7) should have merged. The Grand Theft charge was predicated on obtaining and exerting control over the victim's 2008 Impala. The Aggravated Robbery charge was predicated on the use of a deadly weapon, i.e., the knife and/or dumbbell weight, to commit the theft of the victim's car keys. Stanley maintains: the crimes were of the same import/resulted in the same harm – "the injuries the victim sustained"; comprised the same conduct – "an uninterrupted course of conduct in which the co-defendants set out to obtain possession of this car"; and were motivated by the same animus – "the sole purpose of this entire event was to gain possession of the victim's car." Appellant's brief at 18.

{¶22} Stanley misconstrues the conduct and resulting harm of the two offenses. The Aggravated Robbery was committed by the use of deadly force upon the victim to obtain the keys to the Impala. It may have been necessary to obtain the keys to exercise control of the vehicle but the conduct relative to each action was distinct nonetheless. The crime of Aggravated Robbery was completed when the defendants obtained possession of the keys. The Grand Theft was not committed until the defendants used the keys to exercise control over the Impala itself. Likewise, the animus with which Stanley and the other defendants acted corresponded to the distinctive nature of the acts themselves. Also, the harm of being deprived of one's keys is not the same harm as being deprived of one's vehicle.

8

{¶23} This conclusion is supported by case law both preceding and following the *Ruff* decision. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 54 ("Elmore committed aggravated robbery * * * by taking Annarino's purse after he killed her" and "grand theft * * * *after he left the house* and drove off in Annarino's car"); *State v. Gray*, 11th Dist. Lake No. 2017-L-152, 2018-Ohio-3326, ¶ 17 (when the "[a]ppellant hit Mr. Kuntz with the aluminum bat in order to take his gun * * * the offense of Aggravated Robbery was complete" and when the "appellant went to the closet and took the other firearms * * * [t]he offense of Grand Theft was complete"); *State v. Houseman*, 70 Ohio App.3d 499, 509, 591 N.E.2d 405 (3d Dist.1990) ("[a]ppellant committed aggravated robbery when he committed the theft of Mrs. Swank's car keys and antique gun while in possession of a deadly weapon or dangerous ordnance" and "[g]rand theft was committed when appellant took Mrs. Swank's automobile").

{¶24} The next argument is that Aggravated Robbery (Count 7) and Attempted Murder (Count 1) should have merged. Again, Stanley maintains that the import, animus, and conduct comprising these offenses was the same: "both the Attempted Murder and Aggravated Robbery arose from an uninterrupted course of conduct in which the co-defendants robbed the victim by attempting to kill him" and "the sole motivation here was to gain possession of the victim's car." Appellant's brief at 19.

{¶25} As did the trial court, we find that the level of violence inflicted upon the victim and the resulting injuries were far in excess of that necessary to commit the Aggravated Robbery. The evidence thus demonstrates a separate purpose or animus to kill the victim apart from the purpose of robbing him. The Ohio Supreme Court has long recognized that, in order to commit Murder, Aggravated Robbery need not be committed. *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001). In many cases before

9

and after *Ruff*, then, a separate animus evidenced by the severity of injuries was used as justification for not merging the two offenses. *State v. Flagg*, 1st Dist. Hamilton No. C-170015, 2018-Ohio-1702, ¶ 39 ("[b]ecause the jury determined that Flagg had a specific intent to kill Lowe by finding her guilty of aggravated murder * * *, the aggravated-murder offense was committed with a separate animus or motivation from the aggravated-robbery offense, and thus the two offenses did not merge under R.C. 2941.25(B)"); *State v. Dodson*, 2012-Ohio-5576, 983 N.E.2d 797, ¶ 52 (3d Dist.) ("the infliction of serious physical harm in this instance is so excessive as to clearly constitute conduct well over and beyond any infliction of harm necessary to merely facilitate any theft offense or aggravated robbery" and, therefore, "the stabbings in this case demonstrate an animus directed to the purposeful attempt to cause death which is entirely separate from any infliction of harm related to the theft offense or aggravated robbery"). *State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 43 ("evidence of the manner in which Tibbs had shot Newell in the face and head from relatively close range demonstrated a specific intent to kill Newell, separate from the immediate motive of robbing him").

{¶26} Additionally, at least one post-*Ruff* case has recognized that the harm caused by Attempted Murder and Aggravated Robbery is distinct in that Robbery entails the loss of property whereas Murder the loss of life. *State v. Elem*, 8th Dist. Cuyahoga No. 105821, 2018-Ohio-1194, ¶ 16 ("[w]ith respect to aggravated robbery, the harm was both the property having been stolen from the victim and the terror instilled in the victim by being robbed at gunpoint," whereas "[w]ith respect to attempted murder, the harm was the nearly fatal physical injuries sustained by the victim, as well as the trauma endured by the victim upon being shot twice at close range"). In the present case, the contrast in

10

harm was between the loss of the victim's car keys and life-threatening injuries.

{¶27} The fourth assignment of error is without merit.

{¶28} In the fifth and final assignment of error, Stanley contends that the trial court erred by imposing prison terms that were contrary to law and/or unsupported by the record.

{¶29} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2).

{¶30} "A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing." R.C. 2929.11(A). "The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." *Id.*

{¶31} When imposing a sentence for a felony, the trial court "has discretion to determine the most effective way to comply with the purposes and principles of [felony] sentencing" and "shall consider the factors * * * relating to the seriousness of the conduct" and "the factors * * * relating to the likelihood of the offender's recidivism." R.C. 2929.12(A). A non-exhaustive list of factors relating to the seriousness of the conduct

11

and the likelihood of recidivism is set forth in divisions (B), (C), (D), and (E) of R.C. 2929.12.

{¶32} Stanley's argument is that the trial court's "findings" relative to seriousness and recidivism are not supported by the record and are inconsistent with the statutory factors. The court failed to give deference to the facts that Stanley is impressionable, seeks to please, and has mental health issues. The court failed to give due consideration to mitigating factors such as Stanley's disadvantaged background, limited understanding of events, relatively "minor" criminal history, and remorse. Properly applied, Stanley contends the statutory factors "simply do not support the severity of the sentence given" in his case. Appellant's brief at 25.

{¶33} Stanley mischaracterizes the factors that the trial court must consider as findings that must be made. On the contrary, the law is well-settled that a sentencing court need not make any findings when setting the length of the term of a particular sentence. As stated by the Ohio Supreme Court: "Trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus.

{¶34} Far from mandating definite findings, the Ohio Supreme Court has described Revised Code 2929.12 as "a general judicial guide for every sentencing." *Id.* at ¶ 36. "It is important to note that there is no mandate for judicial fact-finding in the general guidance statutes. The court is merely to 'consider' the statutory factors." *Id.* at ¶ 42. "The Code does not specify that the sentencing judge must use specific language or make specific findings on the record in order to evince the requisite consideration of

12

the applicable seriousness and recidivism factors." *State v. Arnett,* 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000); *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31.

{¶35} The Ohio Supreme Court has further clarified that a sentencing court's compliance with R.C. 2929.11 and 2929.12 does not provide grounds for a reviewing court to vacate or otherwise modify a sentence pursuant to R.C. 2953.08(G)(2). "Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, __ Ohio St.3d __, 2020-Ohio-6729, __, __ N.E.3d __, ¶ 42, *also* at ¶ 39 ("R.C. 2953.08(G)(2)(b) * * * does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12").

{¶36} There is nothing to indicate the trial court failed to consider the principles and purposes of sentencing pursuant to R.C. 2929.11 and the seriousness/recidivism factors of R.C. 2929.12 and the record supports the court's findings.

{¶37} The fifth assignment of error is without merit.

{¶38} For the foregoing reasons, Stanley's sentences are affirmed. Costs to be taxed against the appellant.

MARY JANE TRAPP, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.