[Cite as *State v. Noble*, 2021-Ohio-1062.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

LAKE COUNTY, OHIO


STATE OF OHIO,                          :        **O P I N I O N**

        Plaintiff-Appellee,          :

        - vs -                              :        **CASE NOS.  2020-L-079**
                                                  **2020-L-080**

BRANDON L. NOBLE,                   :

        Defendant-Appellant.       :


Criminal Appeals from the Lake County Court of Common Pleas.
Case Nos. 2017 CR 000705 & 2020 CR 000139.

Judgment:  Affirmed.


*Charles E. Coulson*, Lake County Prosecutor; *Teri R. Daniel* and *Taylor Marie Iacobacci*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Melissa A. Blake*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).


MARY JANE TRAPP, P.J.

{¶1}    Appellant, Brandon L. Noble ("Mr. Noble"), appeals from two judgments of the Lake County Court of Common Pleas.  The first imposed a three-year prison term on a 2017 burglary offense after finding him not amenable to community control sanctions. The second sentenced him in a 2020 case for carrying a concealed weapon, having weapons while under disability, and attempted murder after Mr. Noble was found guilty of shooting the victim, Rodney Hipps ("Mr. Hipps"), in the lower abdomen.

{¶2} Mr. Noble raises six assignments of error on appeal, contending that: (1) the state failed to produce sufficient evidence to establish all elements of the offenses charged beyond a reasonable doubt; (2) his convictions are against the manifest weight of the evidence; (3), (4), & (5) his indeterminate prison sentence of 10 to 15 years for attempted murder imposed pursuant to the Reagan Tokes Act ("the Act") must be reversed because the Act is unconstitutional, violating the doctrine of separation of powers, his right to trial by jury, and his rights to a fair trial and due process. (6) Lastly, he contends the trial court erred by imposing consecutive sentences because its findings pursuant to R.C. 2929.14(C) are not supported by the record and are contrary to law.

{¶3} A review of the record and pertinent caselaw reveals Mr. Noble's assignments of error are without merit. There was more than sufficient evidence to support Mr. Noble's convictions, i.e., that he used a gun, a deadly weapon, to shoot the victim at close range while under community control sanctions for a prior conviction. Moreover, the manifest weight of the evidence weighs heavily in support of his convictions. We decline to address Mr. Noble's third, fourth, and fifth assignments of error attacking the constitutionality of the Act for the first time on appeal because Mr. Noble failed to challenge its constitutionality before the trial court and failed to raise plain error on appeal. Lastly, Mr. Noble's consecutive sentences are supported by the record and not contrary to law.

{¶4} The judgments of the Lake County Court of Commons Pleas are affirmed.

**Substantive and Procedural History**

{¶5} The instant case concerns two separate convictions from 2017 (the "theft case") and 2020 (the "shooting case").

2

{¶6} In 2017, Mr. Noble was convicted of burglary, a second-degree felony, in violation of R.C. 2911.12(A)(2), and sentenced to a four-year term of community control with sanctions and conditions.

{¶7} Five months after his sentence was imposed, the state filed a motion to terminate Mr. Noble's community control because he failed to report to his probation officer and tested positive for marijuana. Mr. Noble pleaded guilty to the charge of violating the terms of his community control. The court continued his community control and imposed new sanctions/conditions, including 60 days in the Lake County jail and completion of the Northeast Ohio Community Alternative Program ("NEOCAP").

{¶8} Several months later, the state filed a second motion to terminate Mr. Noble's community control sanctions because he failed to complete the NEOCAP program. Mr. Noble pleaded guilty to violating the terms of his community control. The court continued his community control sanctions and further imposed new sanctions/conditions, including five days in jail, an additional 30 days in jail in order to participate in the Transitional Day Reporting Program ("TDRP"), and further, upon his release from jail, completion of a program with Beacon Health. The court later suspended the 30-day jail/TDRP upon the recommendation of the Lake County Adult Probation Office because Mr. Noble had secured housing and employment.

{¶9} The state filed a third motion to terminate community control sanctions after Mr. Noble again tested positive for marijuana and failed to report to his probation officer every week. After Mr. Noble pleaded guilty to the charge of violating the terms of his community control, the court continued his community control and imposed further

sanctions/conditions, including one day in jail and successful completion of the Beacon Health program.

{¶10} The state filed a fourth motion to terminate community control sanctions after Mr. Noble failed to appear for his weekly reporting to his probation officer. After he was indicted in the shooting case, the second case in the instant appeal, the state filed a supplement to its motion due to Mr. Noble's additional community control sanction violations, i.e., violating local, state, and federal law; failing to report police contact with his probation officer; and using a firearm.

{¶11} Mr. Noble pleaded guilty to the charges of violating the terms of his community control. After finding that he is no longer amenable to community control sanctions and that prison is consistent with the purposes and principles of sentencing, the court sentenced Mr. Noble to a three-year term of imprisonment, with 470 days of time served, to be served consecutively to the 16 to 21-year prison term imposed in the shooting case.

### Case No. 20-CR-000139 - The "Shooting Case"

{¶12} In March of 2020, Mr. Noble was indicted on six counts in a separate case: Count 1: carrying concealed weapons, a fourth-degree felony, in violation of R.C. 2923.12(A)(2); Count 2: carrying concealed weapons, a fourth-degree felony, in violation of R.C. 2923.12(A)(2); Count 3: having weapons while under disability, a third-degree felony, in violation of R.C. 2923.13(A)(2); Count 4: felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(2), with firearm and repeat violent offender specifications pursuant to R.C. 2941.145 and R.C. 2941.149, respectively; Count 5: felonious assault, a second-degree felony, in violation of R.C. 2911.12(A)(2), with firearm

4

and repeat violent offender specifications pursuant to R.C. 2941.145 and R.C. 2941.149; and Count 6: attempted murder, a first-degree felony, in violation of R.C. 2903.02(A) and R.C. 2923.02, with firearm and repeat violent offender specifications pursuant to R.C. 2941.145 and R.C. 2941.149.

### The Trial

{¶13} The state presented evidence and testimony of eight witnesses during a one-day bench trial that reconstructed the shooting and the events surrounding it.

{¶14} Lieutenant Diana Cichon ("Lt. Cichon") from the Lake County Sheriff's Office was the dispatcher on the night of the incident, October 12, 2019. She testified as to the 911 call reporting a shooting at 547 Lawnview Avenue in the city of Painesville. Later testimony at trial indicated that Fatima Pina ("Fatima") lives at the residence with her children and the children's father. Her parents and her sister, Cynthia Pina ("Ms. Pina"), who is also the mother of Mr. Noble's children, live two houses down from Fatima at 567 Lawnview Avenue. Mr. Noble and his father live at the other end of the street.

{¶15} Patrolman Dallas McCloud ("Ptl. McCloud") from the Painesville Police Department responded to the scene. As he was approaching the 547 Lawnview Avenue residence, he saw a blue Buick Regal parked in the driveway and a black male lying on the ground next to the vehicle. The victim, who was later identified as Mr. Hipps, was in pain and screaming while holding the right side of his abdomen. After the DVD recording from Ptl. McCloud's dashcam of the incident was played for the court, he testified that he lifted up Mr. Hipps's shirt, looking for the bullet wound to apply pressure. The wound was consistent with a 9-millimeter bullet. Near the left rear tire of the vehicle, approximately "a foot and a half away," Ptl. McCloud observed a shell casing that was later identified as

5

a 9-millimeter casing. Once Mr. Hipps was in the ambulance, Ptl. McCloud and the other officer began checking the area for any weapons or more possible bullet casings. The "canvas search" for witnesses and evidence revealed no other firearms, weapons, or ammunition.

{¶16} Ms. Pina testified that she has known Mr. Noble for approximately nine years. In 2018, she started a relationship with Mr. Hipps. Ms. Pina stated that Mr. Noble never had an issue with her dating Mr. Hipps, except he did not want their children around him. Shortly before the shooting on the day of the incident, Ms. Pina had been shopping at Family Dollar with Fatima. As they were returning home, Ms. Pina saw Mr. Hipps's car in Fatima's driveway. She beeped her car horn at Mr. Hipps and turned into her own driveway. Fatima retrieved her items from Ms. Pina's vehicle and walked to her house down the street. Ms. Pina went into the house and gave her children some toys she had purchased. She was in the middle of the living room inside the house when she heard a gunshot. After making sure her children were safe, she began walking towards Fatima's house. She saw Fatima coming out of her house, their neighbor, Cherisse Ferguson ("Ms. Ferguson"), walking down the street, and Mr. Hipps "squatting" on the ground. He was cursing and in pain. She did not see Mr. Noble or anyone besides Mr. Hipps. Both Ms. Ferguson and Ms. Pina called 911. It appeared to her that Mr. Hipps was trying to leave before the police arrived on the scene.

{¶17} Fatima testified that she was cooking hotdogs for her children when she heard a loud bang and Mr. Hipps yelling. She put down the hotdog buns in her hand, grabbed her kids, and threw them on the couch. She told them to "sit down, calm down" and opened the door to go outside. She observed Mr. Hipps trying to "get his phone out

6

to call his baby momma [the mother of his children]. Give me the phone, I'll talk to her. What happened, what happened? He's like I just got shot, I got just [sic] shot."

{¶18} Vernell Durham ("Mr. Durham"), Mr. Noble's acquaintance, was with him on the day of the incident at Mr. Noble's father's house, along with his now-wife, Hannah Durham ("Mrs. Durham"). Mr. Noble, Mr. and Mrs. Durham, and one of the Durhams' two young children sat in Mr. Durham's car. Mr. Durham was "smoking weed," which he estimated took a "long period of time cause I probably smoked three or four blunts."

{¶19} They pulled out of the driveway to go grocery shopping. As they drove down the street, Mr. Noble told Mr. Durham to drop him off at Ms. Pina's house. Mr. Durham continued driving, then Mr. Noble yelled to stop the car. Mr. Noble jumped out of the car, and Mr. Durham pulled over and parked. Mr. Durham jumped out of his car because "there was a lot of people outside so I just seen a lot of people, I thought there was going to be like a fight or something so I jumped out."

{¶20} Mr. Durham saw Mr. Hipps "talking to people. He was kicking it. He was doing a whole bunch of unnecessary stuff." Mr. Durham was talking to Mrs. Durham when they both heard a shot. After the shot, everyone "out on the street ran and disbursed into cars and houses and all that." Mr. Noble returned to the car, and Mr. Durham headed to the freeway. Mr. Noble told Mr. Durham that he "can't believe that happened, can't believe that happened and I was just like what's going on? He didn't say nothing after that. I don't know what's going on but I'm going to drop you off." He drove "somewhere in Euclid" and dropped off Mr. Noble. Mr. Durham never saw anyone that day with a gun.

{¶21} Mrs. Durham, who was in Mr. Durham's vehicle during the shooting, testified that she observed Mr. Noble walking back to the car with nothing in his hands after she

7

heard the gunshot. When Mr. Noble reached the car, he "said come on, let's go." Mrs. Durham heard him say, "Why did I just shoot him over some pu**y."

{¶22} Mr. Hipps testified that he began dating Ms. Pina in late 2018. He had several verbal altercations with Mr. Noble in the past. In one such incident, Mr. Noble found Ms. Pina sitting with Mr. Hipps in Mr. Hipps's car. Ms. Pina attempted to stop an altercation between the two of them. Words were exchanged, and Mr. Hipps left when he saw they were "not about to fight." They had a second similar exchange where Mr. Noble approached Ms. Pina and Mr. Hipps, which ended with Mr. Hipps driving away.

{¶23} On the day of the incident, Mr. Hipps was parked in Fatima's driveway, waiting for Ms. Pina to return home. In his rearview mirror, Mr. Hipps observed a car stop in the middle of the street, and Mr. Noble "hopped out." Mr. Hipps got out of his vehicle and started walking towards Mr. Noble. Mr. Noble was saying "[t]he same things as before you can't pull up here, get the f**k up out of here, I told you not to come over, you know what I'm saying same shit basically."

{¶24} Mr. Hipps responded, "I don't got to get nowhere. I don't got to get the f**k out of here, I'm like I'm here for Cynthia and then he was like who Cynthia, next thing I know I'm shot. I'm pointing cause I swear I see her coming down the street, he turn around, he look at me and shoot, like it was quick." Mr. Hipps did not see a gun when Mr. Noble was walking, but he "did see his hand inside his jacket like he was touching something but I didn't know." He also did not know if Mr. Noble was holding the gun in his left or right hand.

{¶25} Mr. Hipps was shot on the right side of his stomach, close to his pelvis, from a distance of five to six feet. The bullet severed a nerve, causing intense pain and

8

permanent damage in Mr. Hipps's leg. After the police arrived, emergency medical service ("EMS") personnel took him to Tri-Point Hospital. He was then air lifted to Metro Health on the west side of Cleveland. Mr. Hipps underwent abdominal surgery, where his appendix and part of his colon were removed.

{¶26} Officer William J. Sickles ("Officer Sickles") of the Painesville Police Department investigated the incident. He interviewed Mr. Hipps while he was in the hospital. Mr. Hipps identified Mr. Noble as the shooter. Officer Sickles, along with his partner, performed a "canvas search" of the neighborhood, where they spoke to people to identify any witnesses to the incident. Ms. Ferguson, the neighbor who approached Mr. Hipps after the shooting, told him that she did not observe the incident.

{¶27} A warrant was issued for Mr. Noble, and he was arrested several months later in January 2020. The firearm used in this incident was never recovered.

{¶28} After the state rested, Mr. Noble made a Crim.R. 29 sufficiency of the evidence motion, which the trial court denied.

{¶29} The following day, the trial court found Mr. Noble guilty on all six counts and set the matter for a sentencing hearing.

### Sentencing Hearing

{¶30} At the sentencing hearing, the trial court found that: Count 2 (carrying a concealed weapon) merged with Count 1 (carrying a concealed weapon); Count 3 (having a weapon while under disability) did not merge with any other counts; and Count 4 (felonious assault) and Count 5 (felonious assault) merged with Count 6 (attempted murder with firearm and repeat violent offender specifications).

9

{¶31} The court sentenced Mr. Noble to an 18-month term of imprisonment on Count 1, to be served concurrently to a 36-month term of imprisonment on Count 3. A mandatory three-year term of imprisonment was imposed on the firearm specification attached to Count 6, to be served prior to and consecutive to an indefinite term of imprisonment of 10 to 15 years on Count 6. The three-year mandatory term of the firearm specification and the indefinite term of 10 to 15 years on Count 6 were ordered to be served consecutively to the concurrent terms of Count 1 and Count 3, for a total prison term of 16 to 21 years.

{¶32} The court further found that Mr. Noble's three-year term of imprisonment in the previous case will run consecutive to the terms imposed in the shooting case.

{¶33} As for consecutive sentences, the court found, pursuant to R.C. 2929.14(C)(4) and R.C. 2929.19(B)(2)(b), that consecutive sentences are necessary to protect the public from future crime and/or to punish Mr. Noble; that they are not disproportionate to his conduct and the danger he poses to the public; and that he committed one or more of the multiple offenses while under a sanction pursuant to R.C. 2929.16, 2929.17, or 2929.18.

{¶34} Mr. Noble now appeals, raising six assignments of error:

{¶35} "[1.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29(A).

{¶36} "[2.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.

{¶37} "[3.] The defendant-appellant's indeterminate prison sentence of ten to fifteen years on count six, which was ordered pursuant to the "Reagan Tokes Act," aka

10

Senate Bill 201, must be reversed as the Reagan Tokes Act unconstitutionally violates the doctrine of separation of powers.

{¶38} "[4.]   The defendant-appellant's indeterminate prison sentence of ten to fifteen years on count six, which was ordered pursuant to the "Reagan Tokes Act," aka Senate Bill 201, violates his constitutional right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 5 of the Ohio Constitution.

{¶39} "[5.]   The defendant-appellant's indeterminate prison sentence of ten to fifteen years on count six, which was ordered pursuant to the "Reagan Tokes Act," aka Senate Bill 201, violates his constitutional rights to fair trial and due process as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5 & 10 of the Ohio Constitution.

{¶40} "[6.]   The trial court erred by sentencing the defendant-appellant to individual, consecutive prison terms as the trial court's findings with respect to R.C. 2929.14 were unsupported by the record and thus, contrary to law."

### Sufficiency of the Evidence

{¶41}   In his first assignment of error, Mr. Noble contends the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal because the state failed to provide sufficient evidence to establish beyond a reasonable doubt all of the elements of the offenses charged.   Specifically, he argues that no one saw him with a gun, and there is little evidence, if any, that he was responsible for causing that harm.   Assuming arguendo, that he was the shooter, there was insufficient evidence to establish the elements of

11

attempted murder, i.e. there was no evidence that by shooting Mr. Hipps in the lower abdomen, he was, in fact, trying to kill him.

{¶42} Crim.R. 29(A) states that a trial court "shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶43} ""Sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law."" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶44} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 547 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶45} Mr. Noble was convicted of carrying a concealed weapon, having a weapon while under a disability, and attempted murder.

{¶46} Pursuant to R.C. 2923.12(A)(2), carrying concealed weapons, no person shall knowingly carry or have, concealed on the person's person, or concealed ready at hand, a handgun.

{¶47} Pursuant to R.C. 2923.13(A)(2), having weapons while under disability, unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence[.]

{¶48} Pursuant to R.C. 2923.02 and R.C. 2903.02(A), attempted murder, no person shall engage in conduct that, if successful, would purposely cause the death of another.

{¶49} Although there were no eyewitnesses, including the victim, who saw a gun and the gun was never recovered, there was Mr. Hipps's testimony identifying Mr. Noble as the shooter and sufficient circumstantial evidence to support his convictions, i.e., that he used a gun, a deadly weapon, to shoot Mr. Hipps at close range while under community control sanctions for a prior conviction.

{¶50} Circumstantial evidence has the same probative value as direct evidence. See Jenks at 272. Circumstantial evidence can be used to demonstrate an offender's purpose or intent. State v. Martin, 8th Dist. Cuyahoga No. 91276, 2009-Ohio-3282, ¶ 23. The determination of whether an offender had the specific intent to kill is made upon consideration of the facts and circumstances surrounding the crime. State v. Barrow, 8th Dist. Cuyahoga No. 101356, 2015-Ohio-525, ¶ 16. The relevant factors to consider in making this determination include the nature of the instrument used and the lethality of the instrument. Id.

{¶51} Our review of the evidence indicates the state introduced more than sufficient evidence to support Mr. Noble's convictions:  Mr. Hipps identified Mr. Noble as the shooter and testified that Mr. Noble shot him from five to six feet away, and that there was evidence of their tumultuous history that involved several verbal confrontations. Further, both Mr. and Mrs. Durham testified to Mr. Noble's actions both prior to and after the incident, including statements Mr. Noble made once he returned to their vehicle.  All of the witnesses placed Mr. Noble at the scene of the shooting whether before, during, and/or after the incident.

{¶52}  As for Mr. Noble's intent to cause Mr. Hipps's death, the specific intent to kill may be reasonably inferred from the facts that Mr. Noble shot him at close range, i.e., five to six feet, and that a firearm is an inherently dangerous instrument, the use of which is likely to produce death, coupled with relevant circumstantial evidence.  *State v. Searles*, 8th Dist. Cuyahoga No. 96549, 2011-Ohio-6275, ¶ 11.  "[P]ersons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995).  "The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence."  *State v. Brown*, 8th Dist. Cuyahoga No. 68761, 1996 WL 86627, *6 (Feb. 29, 1996).  *See State v. Lucas*, 2020-Ohio-1602, 154 N.E.3d 262, ¶ 71 (8th Dist.).

{¶53}  Mr. Noble's first assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶54}  In his second assignment of error, Mr. Noble contends his convictions are against the manifest weight of the evidence because the greater weight of the testimony

14

suggests that he did not have a gun or a weapon of any kind on the day of the incident. Mr. Noble further argues that even assuming, arguendo, that he shot Mr. Hipps, the manifest weight of the evidence does not support the finding that he was attempting to kill him because he only shot him once in the lower abdomen.

{¶55} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.*

{¶56} "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶57} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1979). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶58} As we just reviewed in Mr. Noble's sufficiency of the evidence argument, the use of a deadly weapon, even when just fired once, is enough to find a purpose to kill.

15

*Lucas* at ¶ 71. The court found the testimony of Ms. Pina and Fatima credible and that they did not observe the shooting since they were inside their respective residences at the time. The testimony of Mr. and Mrs. Durham placed Mr. Noble on Lawnview Avenue at the time the shooting occurred. Mr. Noble exited the vehicle and then returned several minutes later, whereupon he stated, "Why did I shoot him over some p***y." The court also found Mr. Hipps's testimony credible. Mr. Hipps identified Mr. Noble as the person who shot him and testified that Mr. Noble shot him at close range. There is no question that Mr. Hipps was shot with a gun and suffered serious harm.

{¶59} In regard to the issue of the credibility of the witnesses who provided the circumstantial evidence in this case, "the credibility of the witnesses [is] primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 58.

{¶60} Further, "'[w]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. * * * This presumption arises because the [fact-finder] had an opportunity to view the witnesses and observe their demeanor in weighing the credibility of the witnesses.'" *Id.* at ¶ 59, quoting *State v. Reeves*, 11th Dist. Trumbull No. 2006-T-0099, 2007-Ohio-4765, ¶ 14.

{¶61} Given the totality of the circumstances, the evidence more than supports the verdict, and there is no indication that the trial court so lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. *Thompkins* at 387.

{¶62} Mr. Noble's second assignment of error is without merit.

**The Reagan Tokes Act**

{¶63} In his third, fourth, and fifth assignments of error, Mr. Noble attacks the constitutionality of the Reagan Tokes Act, aka Senate Bill 201, arguing that it violates the doctrine of separation of powers, his right to trial by jury, and his rights to a fair trial and due process.

{¶64} The Reagan Tokes Act (the "Act") went into effect in Ohio on March 22, 2019. R.C. 2901.011. The Act requires a sentencing court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a), on or after the effective date, to order a minimum prison term under that provision and a maximum prison term as determined by R.C. 2929.144(B). The Act also sets forth a presumption that an offender "shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(B). The offender's presumptive earned early release date is determined under R.C. 2967.271(F), which permits the sentencing court to reduce the minimum term under certain circumstances. R.C. 2967.271(A)(2). The Department of Rehabilitation and Corrections ("DRC") may rebut the R.C. 2967.271(B) presumption if it determines at a hearing that certain statutorily enumerated factors apply. R.C. 2967.271(C). If the DRC rebuts the presumption, it may maintain the offender's incarceration after the expiration of the minimum prison term or presumptive earned early release date for a reasonable

17

period of time, which "shall not exceed the offender's maximum prison term." R.C. 2967.271(D)(1).

{¶65} Mr. Noble's prison term falls within the sentencing category of R.C. 2929.144(B)(2). That provision specifies that, where an offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and some or all of the prison terms imposed are to be served consecutively, the maximum prison term shall be equal to the sum of the consecutive minimum and definite terms, plus 50 percent of the longest minimum or definite term for the most serious felony being sentenced.

{¶66} Here, the trial court sentenced Mr. Noble to ten years minimum for his most serious qualifying felony, Count 6, attempted murder, a first-degree felony, and a definite term of three years for the firearm specification to run consecutive to concurrent terms of 18 months and 36 months for Count 1 and Count 3, respectively. Thus, under the circumstances of this case, Mr. Noble faces a minimum term of 16 years to a maximum term of 16 years plus 50 percent of the ten-year term, or a total of 21 years.

{¶67} It is a well-established rule that "'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.'" *Awan* at 122, quoting *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus; *see State v. Cargile*, 123 Ohio St.3d 343, 2009-Ohio-4939, 916 N.E.2d 775, ¶ 15. In other words, "the question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." *Awan* at 122.

{¶68} The waiver doctrine in *Awan*, however, is discretionary. Even where waiver is clear, constitutional challenges to the application of statutes may be heard for the first time on appeal, if the court exercises its discretion to do so, "in specific cases of plain error or where the rights and interests involved may warrant it." *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus; *see also State v. Weaver*, 11th Dist. Trumbull No. 2013-T-0066, 2014-Ohio-1371, ¶ 12 (noting that "several appellate districts have reviewed constitutionality issues under a plain error standard despite clear waiver of constitutional issues below").

{¶69} Still, a court may review a trial court's judgment for plain error; however, this requires an appealing party to demonstrate that, but for plain or obvious error, the outcome of the proceeding would have been otherwise and a reversal is necessary to correct a manifest injustice. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. The burden of establishing plain error is on the party asserting it. *Id.* Further, this court must presume the constitutionality of a statute. *Klein v. Leis*, 99 Ohio St.3d 537, 2003-Ohio-4779, 79 N.E.2d 633, ¶ 4. As such, legislation "will not be invalidated unless the challenger establishes that it is unconstitutional beyond a reasonable doubt." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 38-39, 616 N.E.2d 163 (1993). *See State v. Johnson*, 11th Dist. Lake No. 2020-L-051, 2020-Ohio-6807, ¶ 11-13.

{¶70} Mr. Noble, however, does not assert the alleged constitutional infirmities are plain error, and, in light of the presumption of constitutionality, we decline to sua sponte fashion such an argument and evaluate our own construction. *See* App.R. 16(A)(7) (requiring briefs to have "[a]n argument containing the contentions of the appellant with respect to each assignment of error * * * with citations to the authorities * * * on which

appellant relies"); *State v. Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, ¶ 40 (appellate court declined to address constitutionality of Reagan Tokes Law where appellant did not object and did not argue plain error on appeal); *In re J.A.*, 9th Dist. Lorain No. 15CA010794, 2016-Ohio-871, ¶ 4-5 (appellate court declined to advance a plain-error argument on behalf of an appellant challenging constitutional issue on appeal for the first time). *See State v. Ferguson*, 11th Dist. Lake No. 2020-L-031, 2020-Ohio-5578, ¶ 13; *Johnson* at ¶ 14; *State v. Stanley*, 11th Dist. Lake 2020-L-065, 2021-Ohio-108, ¶ 15.

**{¶71}** Mr. Noble's third, fourth, and fifth assignments of error are without merit.

### Consecutive Sentences

**{¶72}** In his sixth and final assignment of error, Mr. Noble submits the trial court erred in sentencing him to consecutive prison terms since the trial court's findings pursuant to R.C. 2929.14(C)(4) were unsupported by the record and, thus, contrary to law. More specifically, he contends the trial court erred in finding that he committed multiple offenses and that his convictions in this case were part of one course of conduct. He claims the trial court further erred by ordering his three-year prison sentence in the theft case to be served consecutively to his convictions in the shooting case.

**{¶73}** The standard of review for the imposition of consecutive prison terms is governed by the clearly and convincingly standard set forth in R.C. 2953.08(G)(2). *See State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.3d 169, ¶ 16. R.C. 2929.41(A) provides, in pertinent part: "Except as provided in * * * division (C) of section 2929.14, * * * a prison term, jail term, or sentence of imprisonment shall be served

20

concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state * * *."

{¶74} Pursuant to R.C. 2929.14(C)(4), a trial court may order multiple prison terms for convictions of multiple offenses to be served consecutively if the court finds that "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public * * *." The trial court must also find that one of the following statutory factors applies:

{¶75} "(a) The offender committed one or more of the multiples offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

{¶76} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶77} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(C)(4)(a)-(c).

{¶78} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing

21

and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶79} Otherwise, the imposition of consecutive sentences is contrary to law. *See id.* The trial court is not required "to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.*

{¶80} As to consecutive sentences imposed at the sentencing hearing, the court found they were necessary to protect the public, were not disproportionate to the seriousness of the offense, and, given his history of criminal conduct, were necessary to protect the public from future crime.

{¶81} Thus, it is clear the necessary findings are in the record and incorporated into the sentencing entry and that the trial court's imposition of consecutive sentences is not contrary to law. The trial court specifically found: Mr. Noble committed one or more offenses while under a sanction imposed pursuant to R.C. 2929.16, R.C. 2929.17, or R.C. 2929.18 of the Revised Code; committed at least two multiple offenses as part of one or more courses of conduct, i.e., attempted murder, carrying a concealed weapon, and having a weapon while under disability; and that his history of criminal conduct indicates consecutive sentences are necessary to protect the public from future crime pursuant to R.C. 2929.14(C)(4).

{¶82} Mr. Noble suggests that it is "unnecessary" that the theft case be served consecutively to terms imposed in the shooting case since the shooting case was the basis for his community control violations. The record in the theft case, however, reveals the probation violation that centered on the shooting case was the fourth time Mr. Noble

22

pleaded guilty to community control violations, which also included drug use, failing to keep appointments with his probation officer, and failing to complete court ordered programs. The court continued his community control sanctions three times. On the fourth violation, the trial court found Mr. Noble was no longer amenable to community control sanctions and imposed the three-year term. In addition, Mr. Noble has a criminal history which includes both juvenile adjudications and adult convictions.

{¶83} We do not clearly and convincingly find that the trial court erred in imposing consecutive sentences pursuant to R.C. 2929.14(C)(4) or that it is contrary to law.

{¶84} Mr. Noble's sixth assignment of error is without merit.

{¶85} The judgments of the Lake County Court of Common Pleas are affirmed.


CYNTHIA WESTCOTT RICE, J.,

THOMAS R. WRIGHT, J.,

concur.