FROELICH, J.
{¶ 1} Daniel G. Schooler appeals from a judgment of the Montgomery County Common Pleas Court that sentenced him to a total of 31 years to life imprisonment on convictions for one count of purposeful murder, two counts of murder (proximate cause), and two counts of felonious assault, each with firearm and repeat violent offender specifications, together with two counts of having weapons under disability. For the reasons that follow, the judgment of the trial court will be affirmed.
Factual Background and Procedural History
{¶ 2} During a Sunday morning worship service on February 28, 2016, Daniel Schooler ("Schooler") entered St. Peter's Missionary Baptist Church in Dayton, Ohio, and took a seat in the church sanctuary. The pastor on that date was Schooler's older brother, 70-year-old William Schooler ("William"). After finishing a prayer before the congregation, William left the sanctuary to prepare for his sermon while the choir sang. Soon thereafter, Daniel Schooler followed his brother into the pastor's office behind the sanctuary.
{¶ 3} Moments later, two or three gunshots rang out and most of the congregation fled the building, but William's wife, Helen Schooler, ran into the pastor's office.
*470 Mrs. Schooler could not see her husband, but she saw his desk chair overturned behind his desk and Daniel Schooler "standing at the side of [that] desk" with a gun "pointed down" toward the floor behind the desk. When she asked Schooler to allow her to go to her husband, "he just said something about [William] shouldn't have lied." She then witnessed Schooler fire toward the floor behind the desk. At that point, Mrs. Schooler went to a different office and dialed 911.
{¶ 4} In response to 911 calls about a shooting, two Dayton police officers arrived and entered the church through a rear door. Officer Kevin Johnson ("K. Johnson") immediately turned left into the sanctuary, where he saw Daniel Schooler seated in a chair, with both hands resting on top of his cane. Officer K. Johnson asked, "Where's the shooter?" Schooler calmly responded, "I'm the shooter." Asked the location of the gun, Schooler gestured toward the pastor's office and answered, "It's in there."
{¶ 5} Meanwhile, Officer K. Johnson's partner, Officer Robert Clingner, had turned right, into the hallway and office area of the church. When a third police officer, Officer Josh Johnson, arrived, he and Officer Clingner searched that portion of the building. Inside the pastor's office, Officer Clingner located William Schooler, who was dead. According to Officer Clingner, William's "legs and torso were pretty much underneath his desk like he had fallen out of the chair under his desk." A handgun was on the desk, with the magazine or clip removed and resting atop the desk.
{¶ 6} Officer Clingner then joined Officer K. Johnson in the sanctuary, where Officer Clingner conducted a pat down of Daniel Schooler while Officer K. Johnson placed him in handcuffs. Inside Schooler's jacket pocket, Officer Clingner found a pill bottle containing five rounds of ammunition.
{¶ 7} At that time, Officer K. Johnson saw Helen Schooler in the sanctuary, crying and "in shock." He took her outside, where she told him that an "ongoing dispute" had existed "for years" between her husband, William, and his brother Daniel. At trial, Mrs. Schooler described the relationship between her husband and Schooler as "tense" in recent years, after Schooler "sued the church."
{¶ 8} Witness Willie Bowman, a nephew of both William Schooler and Daniel Schooler, testified that he was standing with William in the driveway of William's home in the summer of 2015 when Daniel Schooler slowed down in a passing car, said "I'm going to kill you" to William, and drove away.
{¶ 9} Crime scene investigator John Malott of the Dayton police department testified that he was called to process the scene at St. Peter's Missionary Baptist. William Schooler's body, with "obvious bullet wounds," still was on the floor behind his office desk when CSI Malott arrived. Malott described the pastor's office as being approximately 12 feet by 12 feet and "well lived in," containing a couch, desk, desk chair, other chairs, bookshelves, boxes of books, "a couple of tables," and a television. William's desk "appeared to have been moved" and the desk chair had been placed on the couch, presumably to make room for paramedics who had attended to William before Malott arrived. On the desk was an empty Kel-Tech .380 caliber semi-automatic pistol, alongside an empty clip. The .380 caliber ammunition taken from Daniel Schooler's pocket matched the caliber of that handgun. A search of the office revealed two spent bullets and four spent casings, but no other *471 gun or other items that could have been used as a weapon.
{¶ 10} Chris Monturo, a forensic firearm and tool mark examiner with the Miami Valley Regional Crime Laboratory, testified as an expert witness in the area of firearm identification. Monturo testified that the spent bullets and casings recovered from the pastor's office, as well as three bullets recovered from William Schooler's body by the coroner's office, were fired from the Kel-Tech .380 caliber semi-automatic handgun found at the crime scene.
{¶ 11} Montgomery County Chief Deputy Coroner Lee Lehman testified as an expert in forensic pathology about the results of the autopsy he performed on William Schooler. Using photographs from the autopsy, Dr. Lehman identified four gunshot entrance wounds on William's body. One was "on his left arm just above the elbow," one was "on his lower abdomen in the region of his belly button," one was "by his left hip," and one was "on his left shoulder." Only the arm wound had a corresponding exit wound ; three bullets remained inside the body.
{¶ 12} Dr. Lehman said that the bullet which entered William's arm traveled "from his left side to his right side and ... from the back of his arm toward the front of his arm." The bullet that entered William's left shoulder "went to the left side of his chest[;] * * * bruised his left lung; went across the center of his chest through his esophagus, through his right lung, and into the right side of the chest." The bullet that caused the wound on William's abdomen "passe[d] under the skin without entering the abdomen or entering the chest," lodging under the skin on the right side of William's chest.
{¶ 13} The remaining bullet, which entered above William's left hip, "passe[d] through the abdomen[,] through * * * the small bowel - the tissue that contains the blood vessels and supports the bowel[,] through the aorta and then into the right side of the abdomen or just above the hip," where it came to rest beneath the skin. The aortic injury would have been fatal in "[m]inutes." Dr. Lehman opined that William Schooler "died of multiple gunshot wounds," and that his death was a homicide.
{¶ 14} Daniel Schooler was the only defense witness. He told the jury that he was one of 13 children of the man who founded St. Peter's Missionary Baptist Church. According to Schooler, his mother inherited the church real estate and other assets when his father died. When his mother died in about 1990, his brother William became the executor of her estate. Schooler asserted that William and two other Schooler brothers mishandled the estate and kept assets for themselves that should have belonged to all the surviving family members. He said he went to St. Peter's on February 28, 2016 to tell William that he planned "to take him back to court again"[1] regarding the disputed inheritance. Schooler said he had hoped that William "would change his mind so that we wouldn't have to go to court and bring everything out." He thought the church "would be the best place" to approach his brother, because he wanted to be in a "public" location and not go to William's home, to "ma[ke] sure other people were around."
{¶ 15} Schooler said he followed William into the pastor's office and closed the door in order to talk to William, who was seated *472 at his desk. He described the door as being "about * * * four feet" from the end of the desk. According to Schooler, when he told William of his intention to file a lawsuit, William "became very upset and came to attack me." Schooler reported that William "raised up out of the chair, reached toward me, I backed to the door, but there's a chair on the side and the door was closed and I was afraid." With his back nearly against the door, Schooler "felt trapped and afraid. So I pulled the pistol I had in my pocket and I fired twice. And he continued to reach toward me so I fired again." Schooler said he fired the third shot because William was "still advancing[,] trying to - trying to get toward me," so Schooler still was afraid. He claimed that William "had made advances to harm me before."
{¶ 16} Schooler testified that he carried the subject gun "[j]ust about all the time," because he had been pushed around and robbed "about three times" in the past and worried about his ability to protect himself, given his age and his use of a cane. After he shot William, he "[p]ut the gun down and left the room and sat down" in the church sanctuary. He said he did not remember removing the magazine from the empty weapon, but attributed that action to "habit" acquired from being trained "in the service a long time ago." When a police officer entered the sanctuary and "asked who was the shooter * * *.[,] I told him that I was." He said he did not know then whether William was dead. He never denied responsibility for the shooting, but testified that he had not expected the day to turn out the way it did.
{¶ 17} On cross examination, Schooler indicated that he shot William "I think it was twice" before William's wife entered the office. He said that William "stumbled backwards" and fell to the floor "on the other side of the desk" before Helen Schooler entered. When Mrs. Schooler came in, Schooler was standing between Mrs. Schooler and her husband. At that time, "I sho[t] once into the floor. She was standing right there beside me." He denied that he fired the final shot at William. Schooler stated that the gun "probably" was already in his coat pocket when he put the coat on that morning, with five bullets loaded in the clip and additional ammunition in the pocket. He acknowledged that he "probably" moved one bullet into the chamber, making the gun ready to fire, before he drove to the church. Schooler said that he "was in a panic position" when William started to advance toward him, and that he "never even thought of calling out" for help. He did not try to open the office door because he was looking at William and "thought he had something in his hand * * * [I]t was something shiny. I don't know[,] was it [a] fist balled up and a ring[?] I don't know what it was."
{¶ 18} Schooler was indicted on March 9, 2016, on one count of aggravated murder in violation of R.C. 2903.01(A), two counts of felony murder in violation of R.C. 2903.02(B), and two counts of felonious assault in violation of R.C. 2903.11(A)(1) & (A)(2), with firearm and repeat violent offender specifications on all five of those counts. He also was charged with two counts of having weapons under disability in violation of R.C. 2923.13(A)(2). Schooler entered a plea of not guilty, and the trial court granted his attorney's motion for a competency evaluation.
{¶ 19} Based on a psychiatric report prepared in response to that initial motion, the trial court on June 27, 2016 found Schooler competent to stand trial. Schooler's attorney filed a motion for a second competency evaluation, and the trial court ordered Schooler to appear for another forensic evaluation. Following receipt of that second report, the State moved for a *473 third forensic evaluation, which the trial court granted.
{¶ 20} On January 26, 2017, the trial court held a competency hearing, at which three expert witnesses appeared and expressed their opinions regarding Schooler's competence to stand trial. Following that hearing, the trial court ruled that Schooler was competent to stand trial. The matter proceeded to a jury trial beginning on June 12, 2017.
{¶ 21} Before the jury was empaneled, Schooler rejected the trial judge's suggestion that he permit the repeat violent offender specifications and the two counts of having weapons under disability to be heard by the court rather than a jury. The voir dire and opening arguments therefore included discussion of all charges against Schooler. At the end of the second day of trial, however, Schooler changed his mind and agreed to waive his right to a jury on the repeat violent offender specifications and having weapons under disability charges.
{¶ 22} On June 14, 2017, the jury found Schooler not guilty of the Count One charge of aggravated murder (prior calculation/design), but guilty of the lesser included offense of murder (purposely). They also found him guilty of Counts Two and Three, felony murder, and Counts Four and Five, felonious assault, as well as guilty of firearm specifications on all five counts. Separately, the trial court found Schooler guilty of Counts Six and Seven (having weapons under disability) and the repeat violent offender specifications on Counts One through Five.
{¶ 23} The transcript of Schooler's sentencing hearing reflects that the court proceeded in Schooler's absence because he refused to attend. At sentencing, the trial court merged the two counts of murder and the two counts of felonious assault into the Count One conviction of purposeful murder, on which the court sentenced Schooler to a mandatory prison term of 15 years to life. After also merging the five firearm specifications and the five repeat violent offender specifications into a single specification of each, the court sentenced Schooler to a mandatory prison term of three years on the firearm specification to purposeful murder and a mandatory prison term of 10 years on the repeat violent offender specification to purposeful murder, to be served consecutively and prior to the prison term for purposeful murder. Finally, after merging the counts of having weapons while under disability into a single offense under Count Six, the court sentenced Schooler to a prison term of 36 months on that conviction, to "be served consecutively to the prison terms for purposeful murder and the firearm and repeat violent offender specifications * * * [,] resulting in an effective prison sentence of 31 years to life in prison."
{¶ 24} Schooler appeals from that judgment, raising two Assignments of Error:
1) The Trial Court erred in convicting Appellant of Murder and Felonious Assault because Appellant proved he acted in self-defense and thus such convictions were against the manifest weight of the evidence.
2) The Trial Court abused its discretion in finding that Appellant was competent to stand trial as such determination was not supported by competent and credible evidence.
Competence to Stand Trial
{¶ 25} If successful, Schooler's assignment of error challenging his competence to stand trial would obviate the need to address his challenge based on the weight of the evidence. For that reason, we first will address Schooler's second assignment of error.
*474 {¶ 26} Criminal defendants are presumed to be competent to stand trial, but that presumption is rebuttable. See R.C. 2945.37(G). "If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against [him or her] or of assisting in [his or her] defense, the court shall find the defendant incompetent to stand trial." Id.
{¶ 27} The test for determining whether a defendant is competent to stand trial is whether he or she has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and whether the defendant has a rational and factual understanding of the proceedings against him or her. State v. Ferguson , 2018-Ohio-987, 108 N.E.3d 1161, ¶ 18 (2d Dist.) ; State v. Neyland , 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 32, citing State v. Berry, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995) and Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). To determine if incompetence has been established, courts should consider the following: "(1) doubts expressed by counsel as to the defendant's competence; (2) evidence of irrational behavior; (3) the defendant's demeanor at trial; and (4) prior medical opinion relating to competence to stand trial." State v. Rubenstein, 40 Ohio App.3d 57, 60-61, 531 N.E.2d 732 (8th Dist.1987) ; Ferguson at ¶ 18.
{¶ 28} Because a defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and assisting his counsel, incompetence must not be equated with "mere" mental illness or emotional instability. Ferguson at ¶ 19, citing State v. Bock, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986) ; State v. Fahl, 2d Dist. Clark No. 2005-CA-98, 2006-Ohio-1809, 2006 WL 925180, ¶ 8. Accord State v. Smith, 89 Ohio St.3d 323, 329, 731 N.E.2d 645 (2000).
{¶ 29} Due to the presumption of competence, the burden is on the defendant to prove by a preponderance of the evidence that he is not competent. Ferguson at ¶ 20, citing State v. Jordan, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28 ; R.C. 2945.37(G). A trial court's finding that a defendant is competent to stand trial will not be disturbed on appeal when some reliable and credible evidence supports that finding. State v. Were, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 46.
{¶ 30} At his January 26, 2017 competency hearing, Schooler called one expert witness. Dr. Douglas Lehrer[2] testified that he met with Schooler three times at the Montgomery County jail in late July or early August of 2016. He also spoke to one of the deputies who observed Schooler at the jail, reviewed some video of Schooler's behavior while in custody, and interviewed Schooler's three daughters. Dr. Lehrer discerned that Schooler believed "he has been the target of an ongoing persecution that has lasted for 50 years" and that the "local judiciary" was among those involved in that persecution. Dr. Lehrer opined that Schooler's delusions to that effect "distort his understanding of the process," and "sufficiently color[ ] his factual and rational understanding of the proceedings to meet the legal test for incompetence to stand trial.".
{¶ 31} Two expert witnesses for the State disagreed with Dr. Lehrer's conclusion. Dr. Scott Thomas Kidd met with Schooler three times, on April 8, 13 and 27, 2016. Additionally, he spoke with Schooler's *475 oldest daughter. Asked specifically about Schooler's comprehension of the legal process surrounding his prosecution, Dr. Kidd testified as follows:
Q: Did you talk about the role of the - where people would sit in the courtroom and where people would be in the courtroom?
A: Yes.
Q: How did he do with that?
A: He did fine.
Q: Did you talk about the role of the individuals in the courtroom, the [j]udge, the [d]efense attorney, the lawyers?
A: Yes.
Q: How did he do with that?
A: He seemed to have an adequate understanding of the basic function [of] people in the courtroom.
Q: Did you talk with him about what witnesses would do, what spectators might do in the courtroom?
A: Yes.
Q: Did he seem to have an understanding of that?
A: Yes.
Q: Did you talk to him about whether or not he would be forced to testify at his own trial?
A: Yes. I asked him that question.
Q: And tell us about that.
A: He said that he would not - he could not be made to testify because of the potential [for] self-incriminating.
Q: Did you do anything to assess his problem solving abilities related to being in court?
A: Yes.
Q: Tell us about that.
A: Well, I asked a few questions about just made up scenarios such as if he was testifying and he was asked a question that he didn't understand or if one of the attorneys objected to a question that the other attorney asked. I asked him in terms of plea deals. I gave him a hypothetical case and then gave him several plea options or plea deals and went in order and asked him whether the defendant in the hypothetical case should or shouldn't accept the plea deal and why or why not.
Q: How did he do in response to those type[s] of questions?
A: I felt like he did fine. With the questions as far as courtroom situations, for example, if he were asked a question while he was testifying that he didn't understand, he said that he wouldn't answer unless he understood or he would ask for clarification. If there was an objection made, he said he wouldn't do anything. He wouldn't respond.
As far as the hypothetical case I gave him, he seemed to understand that it would not make sense for a [d]efendant to accept a plea deal, to plead guilty and accept a deal, if it were for the maximum sentence. He seemed to understand that as the sentence - as the deal got better, you know, as the sentence was lower, that that would be a better deal for the defendant and that the defendant should not accept a deal for a higher sentence if they feel like they have a chance of getting a lower sentence.
Q: During those hypotheticals, did he interact with you appropriately?
A: Yes.
Q: Did he ever ask you any follow up questions about the hypothetical you were giving him?
A: I recall one question he asked me and it was related to the defendant's chance of winning the case. And so he wanted to know what [was] the defendant's chance of winning the case before he answered *476 a question about whether he should take a plea deal.
Q: Did that seem like a reasonable question for somebody to ask?
A: Yes.
(Tr., Vol. I, pp. 46-49).
{¶ 32} Dr. Kidd's professional opinion was that Schooler "is able to understand the nature and objectives of the proceedings against him and able to assist in his defense."
{¶ 33} The State's second expert, Dr. Jordan B. Bell, echoed that opinion. Dr. Bell met with Schooler "for a total of four days in October 2016." Dr. Bell's findings differed from those of Dr. Lehrer, as he concluded that Schooler's "paranoia or persecutory ideas * * * are not persistent, and he has the ability to switch from a fantasy based point of view to a reality based point of view." "[Schooler] certainly feels very wronged by life, by circumstances, by certain family members, by the courts perhaps, by the police, and yet this is a preference that he has for coping with life that he can turn on or off." Dr. Bell opined "that Mr. Schooler does have a factual as well as rationale understanding of the proceedings and can rationally assist [his attorney] in his own defense and therefore, it's my recommendation that he is competent to stand trial at the time that I met with him."
{¶ 34} On appeal, Schooler argues that he has "a history of mental illness" that "clouds his ability to understand the legal process" and "hampers his ability to assist his counsel in his defense." Diagnosis with a mental illness, however, is not dispositive of a criminal defendant's competence to stand trial. See Ferguson , 2018-Ohio-987, 108 N.E.3d 1161, at ¶ 18 (2d Dist.). Indeed, Dr. Kidd indicated he believed that Schooler "is mentally ill," but nonetheless concluded that despite Schooler's "history and the symptoms that he was currently exhibiting," Schooler's mental illness "was not interfering with his ability to understand the nature and objectives of the proceedings or participate in his defense."
{¶ 35} The testimony of Drs. Kidd and Bell constitutes reliable and credible evidentiary support for the trial court's finding that Schooler was competent to stand trial. See Were, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 46. Thus, Schooler's second assignment of error is overruled.
Manifest Weight of the Evidence
{¶ 36} An argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." State v. Martin , 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, 2017 WL 3880941, ¶ 8, quoting State v. Wilson , 2d Dist. Montgomery No. 22581, 2009-Ohio-525, 2009 WL 282079, ¶ 12. When reviewing an argument challenging the weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " State v. Webber , 2015-Ohio-2183, 35 N.E.3d 961, ¶ 8 (2d Dist.), quoting State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).
{¶ 37} In effect, an appellate court that reverses a conviction based on the weight of the evidence "sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Thompkins at 387, 678 N.E.2d 541, quoting Tibbs v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
*477 Given that the jury saw and heard the witnesses at trial, however, "we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." Martin at ¶ 8, citing State v. Lawson , 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." Webber at ¶ 8, quoting Thompkins at 387, 678 N.E.2d 541.
{¶ 38} Schooler argues that his convictions were against the manifest weight of the evidence showing that he shot his brother in self-defense. Upon reviewing the trial record and considering the witness testimony and the physical evidence presented, we disagree.
Self-defense claim
{¶ 39} In Ohio, self-defense requires proof of three elements: 1) the defendant did not create the violent situation, 2) the defendant had a bona fide belief that he was in danger of death or great bodily harm and that the only way to escape was the use of force, and 3) the defendant did not violate any duty to retreat. Martin , 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, at ¶ 39, citing State v. Williford , 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990). The use of a gun constitutes the use not only of force, but of deadly force. State v. Dale , 2d Dist. Montgomery No. 2012-CA-20, 2013-Ohio-2229, 2013 WL 2406261, ¶ 15. To justify the use of deadly force, the defendant must show that no means of retreat or avoidance was available to him and that his only means of escape or avoidance was the deadly force he used. Id. , citing State v. Kucharski, 2d Dist. Montgomery No. 20815, 2005-Ohio-6541, 2005 WL 3358860, ¶ 20. The defendant bears the burden of proving self-defense. Martin at ¶ 41 ; Dale at ¶ 18.
{¶ 40} The sole evidence supporting Schooler's self-defense theory was his own testimony that when he went into his brother's office to discuss their ongoing inheritance dispute, his brother became angry and advanced toward him in what Schooler perceived to be a threatening manner. Schooler said that because he "felt trapped and afraid," he fired twice at William, but William kept advancing, so Schooler fired at him once more. He claimed to have fired a fourth shot into the floor after William fell and William's wife entered the room.
{¶ 41} Schooler admitted, however, that when he entered his brother's office, he had in his pocket a handgun loaded with five bullets, one of which he had moved into the firing chamber "when I got ready to leave home" that morning. (Tr., Vol. IV, p. 560). He also confirmed that before opening fire, he never called out for help or tried to open the office door in an effort to flee. (Id. at pp. 566-567).
{¶ 42} Upon review of the evidence, we cannot conclude that the jury "clearly lost its way" in assessing the validity of Daniel Schooler's self-defense claim. See Webber , 2015-Ohio-2183, 35 N.E.3d 961, ¶ 8. Aside from vague allusions to William's having "made advances to harm me before" (id. at p. 537),[3] Schooler articulated no reason to believe that he was "in danger of death or great bodily harm" when his brother moved toward him within the pastor's office. See Martin at ¶ 39. He identified no specific threats made by William on that day or previously, nor any injuries ever suffered at William's hands. Although he *478 suggested on cross-examination that William appeared to have something "shiny" in his hand as he advanced, Schooler testified that the shiny object he perceived could have been "a ring." Furthermore, Schooler's own gun was the only weapon that police officers found in the pastor's office. Accordingly, the weight of the evidence does not support a conclusion that Schooler had a bona fide fear of death or great bodily harm due to William's actions preceding the shooting.
{¶ 43} Neither does the weight of the evidence dictate a conclusion that Schooler satisfied either of the other elements of self-defense. Given that Schooler deliberately followed his brother into William's office and shut the door behind him while armed with a fully loaded weapon, the jury reasonably could have rejected Schooler's claim that he "did not create the violent situation."[4] See id. Similarly, the evidence could support a determination that Schooler "violated a duty to retreat" before resorting to the use of deadly force against an unarmed 70-year-old pastor advancing on foot from a seated position behind a desk. See id. Based on the evidence of record, a reasonable jury could conclude that Schooler failed to satisfy his burden of proof to show that he acted in self-defense.
{¶ 44} Moreover, other credible evidence casts doubt on Schooler's version of events. Although Schooler claimed that his brother had advanced and trapped him against the office door, Officer Clingner testified that he found William's body with his "legs and torso * * * pretty much underneath his desk like he had fallen out of the chair under his desk." CSI Malott and photographs taken in the office indicated that the pastor's desk had to be moved in order for paramedics to access William's body. Only Schooler's own testimony suggests that William advanced from behind his desk before he was shot.
{¶ 45} In addition, the chief deputy coroner testified that William was struck not by three bullets, as Schooler described, but by four bullets. The most lethal of those shots entered through William's left hip, traversing the width of his body, through his small intestine and aorta, before coming to rest in the right side of his abdomen. Another bullet entered William's left shoulder, moving from the left side to the right side of his chest, where it was found upon autopsy. A third bullet passed through William's left arm from back to front, without penetrating his torso. The fourth bullet passed "under the skin" from William's abdomen up to his chest without causing any significant internal injuries. The varying trajectories of those wounds are not consistent with a person who was shot only while actively advancing toward the shooter. The evidence of both the number and nature of the wounds found on William's body lends credence to Helen Schooler's testimony that Schooler appeared to fire an additional bullet into her husband's prostrate form after she entered the pastor's office, and tends to discredit Schooler's testimony that he did not do so, but fired into the floor.
{¶ 46} The evidence also demonstrates that Schooler fired a total of five shots rather than the four to which he testified. Three bullets were recovered from William's body during autopsy, and two additional spent bullets were recovered from inside the pastor's office. Indeed, Schooler himself testified that his gun contained five bullets when he entered William's office *479 and that the gun was empty when he finished firing and left that weapon and its magazine on top of his brother's desk. While a jury could resolve certain discrepancies between Schooler's testimony and other evidence of record in favor of either party, the physical evidence at the crime scene and Schooler's own admissions reveal his accounting of the number of shots fired to be demonstrably untrue. That fact reasonably could have influenced the jury's credibility determination with respect to the entirety of Schooler's testimony.
{¶ 47} The weight of the evidence presented at Daniel Schooler's trial does not support a conclusion that the guilty verdict created "a manifest miscarriage of justice" requiring that his conviction be reversed. See Webber , 2015-Ohio-2183, 35 N.E.3d 961 at ¶ 8. As a result, Schooler's first assignment of error is overruled.
Conclusion
{¶ 48} The judgment of the trial court will be affirmed.
DONOVAN, J. and TUCKER, J., concur.

On cross-examination, Daniel Schooler acknowledged that he unsuccessfully had sued William over the estate in 2011.

Dr. Lehrer's last name is misspelled in the record as "Leherer." (See Tr., Vol. I, p. 9).

Daniel Schooler elsewhere suggested that William Schooler or another brother had "attacked" him or done "things" to him previously (see Tr., Vol. IV, pp. 532, 566), but provided no details and no other evidence to corroborate that claim.

Also germane to that element is the testimony of Schooler's nephew, Willie Bowman, that he heard Daniel Schooler deliver an unprovoked threat to "kill" William Schooler the summer before the actual shooting occurred. (See Tr., Vol. III, pp. 462-464).