[Cite as *State v. Spurrier*, 2021-Ohio-1061.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | **CASE NO. 2020-L-069** |
| - vs - | : | |
| PATRICK SPURRIER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas.
Case No. 2019 CR 000848.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

MARY JANE TRAPP, P.J.

{¶1} Appellant, Patrick Spurrier ("Mr. Spurrier"), appeals from his convictions for attempted murder, aggravated robbery, grand theft of a motor vehicle, and two counts of tampering with evidence involving an incident in which Mr. Spurrier, with the help of two acquaintances, brutally stabbed the victim, beat him with a 20-lb dumbbell, and stole his vehicle.

{¶2} Mr. Spurrier raises two assignments of error for our review, contending that the trial court erred by: (1) finding him competent to stand trial because it was clear by the evidence presented at the competency hearing that his "mental health difficulties" would have made it impossible for him to proceed to a trial, and (2) failing to merge the counts of attempted murder, aggravated robbery, and grand theft of a motor vehicle, and, as to each other, the two counts of tampering with evidence, because they were committed with the same animus during a short period of time.

{¶3} After a review of the record and pertinent caselaw, we find Mr. Spurrier's assignments of error without merit.

{¶4} A review of the competency hearing and the testimony and reports of the experts reveals the trial court's finding that Mr. Spurrier was competent to stand trial is supported by some competent, credible evidence. All three of the experts agreed that Mr. Spurrier suffered from a variety of mental health issues but that he understood the nature and objectives of the proceedings against him. Only one expert felt Mr. Spurrier needed time to adjust his medication in order to assist in his own defense, but even that expert opined that Mr. Spurrier understood the nature and objective of the proceedings against him and that he could be redirected and refocused with the help of defense counsel when his conversation went off on a tangent.

{¶5} A review of the evidence reveals Mr. Spurrier's convictions for attempted murder, aggravated robbery, and grand theft of a motor vehicle were not allied offenses of similar import subject to merger for purposes of sentencing since they were committed with a separate animus and separate, identifiable harm sufficient to support separate convictions.

{¶6} Similarly, the two counts of tampering with the evidence were not allied offenses because they were two separate acts committed to discard two separate pieces of evidence, i.e., the bandana used to cover the knife Mr. Spurrier used to stab the victim, which was discarded in the dumpster behind a pharmacy, and the knife itself, which was discarded in a park in Painesville.

{¶7} The judgment of the Lake County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶8} Mr. Spurrier was arrested several days after the incident in Niles, Ohio. He was apprehended after a police chase and crash while driving the stolen vehicle of the victim, Christopher Martin ("Mr. Martin").

{¶9} Mr. Spurrier was bound over by the Painesville Municipal Court to the Lake County Court of Common Pleas, where a grand jury indicted him on 12 counts: Count 1: attempted murder, a first-degree felony, in violation of R.C. 2923.02 and 2903.02(A); Count 2: felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1); Count 3: felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(2); Count 4: kidnapping, a first degree-felony in violation of R.C. 2905.01(A)(2); Count 5: kidnapping, a first-degree felony, in violation of R.C. 2905.01(A)(3); Count 6: grand theft of a motor vehicle, a fourth-degree felony, in violation of R.C. 2913.02(A)(1); Count 7: aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(A)(1); Count 8: aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(A)(3); Count 9: aggravated burglary, a first-degree felony, in violation of R.C. 2911.11(A)(1); Count 10: aggravated burglary, a first-degree felony, in violation of R.C. 2911.11(A)(2); Count 11

3

and Count 12: tampering with evidence, third-degree felonies in violation of R.C. 2921.12(A)(1).

### Competency to Stand Trial

{¶10} As relevant to this appeal, Mr. Spurrier filed a motion requesting that the court order an evaluation to determine his competency to stand trial, as well as an evaluation to determine whether he had the mental capacity to understand his legal rights at the time of interrogation. An oral hearing was requested.

{¶11} Ultimately, the court ordered three competency evaluations. The first was performed by the court psychologist, Dr. Jeff Rindsberg ("Dr. Rindsberg"), of the Lake County Adult Probation Department. Dr. Rindsberg was tasked to examine and evaluate Mr. Spurrier's competency pursuant to R.C. 2945.37 and R.C. 2945.371 (competence to stand trial and evaluations of mental condition, respectively). The court further found that Mr. Spurrier's request for an evaluation to determine whether his mental capacity to understand his legal rights at the time of the interrogation was premature and would be considered "if and when a motion to suppress is filed."

{¶12} Next, the court granted Mr. Spurrier's oral motion for a subsequent competency evaluation and ordered an evaluation by Dr. Farshid Afsarifard ("Dr. Afsarifard").

{¶13} Lastly, the court granted the state's motion for a third competency evaluation and ordered an evaluation by Dr. James Eisenberg ("Dr. Eisenberg").

{¶14} The court held a competency hearing in which all three experts testified and their reports were entered into evidence.

4

{¶15} Dr. Afsarifard opined that "based on reasonable psychological certainty, [Mr. Spurrier] has a reasonable understanding of the factual and procedural aspect of the case that has been brought against him. It is also my opinion that because of his mental illness, Mr. Spurrier is unable to effectively participate in his defense and collaborate with his attorney in a meaningful manner." It was his belief that Mr. Spurrier required a "comprehensive psychiatric evaluation" to adjust his medications to address his psychotic symptoms and cognitive impairment, as well as behavioral treatment. Dr. Afsarifard opined that Mr. Spurrier can be restored to competency after he is psychologically stabilized. He did not review the specific facts of the case with Mr. Spurrier. He found Mr. Spurrier displayed disorganized thinking, often answering and discussing irrelevant topics, such as his girlfriend, but that he could be redirected. While his symptoms "interfered at times" during their interview, Dr. Afsarifard testified that Mr. Spurrier was able to provide the information requested from him.

{¶16} Dr. Rindsberg opined "with reasonable psychological certainty, that Mr. Spurrier understands the nature and objectives of the proceedings and can assist with his defense." While noting that Mr. Spurrier has a history of many major mental health problems, Dr. Rindsberg found that Mr. Spurrier was calm and cooperative, communicated appropriately, and was able to report information about what is alleged to have occurred. "Part of why he is still upset lately is because he understands the severity of what he has been charged with."

{¶17} Dr. Eisenberg opined "with reasonable psychological certainty, that the aggregate of information supports the conclusion that Mr. Spurrier, at the time of the interview for this evaluation, was able to understand the nature and objective of the

proceedings against him and of assisting in his defense." He found that Mr. Spurrier demonstrated a delay in responding to some questions, which may be indicative of his ADHD issue, and that the court may want to allow him more time to process proceedings and to have an opportunity to consult with his attorney should he need to. "The delay in his responding is not defiant or indicative of any non-compliance."

{¶18} After considering the testimony and the expert reports, the court found that given Mr. Spurrier's present mental condition, he was capable of understanding the nature and objective of the proceedings against him and of assisting in his defense. Thus, the court concluded that Mr. Spurrier was competent to stand trial pursuant to R.C. 2945.371.

### Change of Plea Hearing

{¶19} The case proceeded to a change of plea hearing. At the hearing, the prosecutor proffered the agreed facts before the court.

{¶20} To summarize, three co-defendants, Mr. Spurrier, David Stanley ("Mr. Stanley"), and Michael Joyce ("Mr. Joyce"), were involved in the July 31, 2019 incident. All three co-defendants, plus another friend, Rebecca Sladek ("Ms. Sladek"), were at Arby's Restaurant in Painesville, Ohio. Mr. Spurrier wanted Mr. Stanley and Mr. Joyce to assist him in taking car keys from the victim, Christopher Martin ("Mr. Martin"), who lived nearby, and steal his motor vehicle, a 2008 Chevy Impala. Mr. Spurrier wanted their assistance in case Mr. Martin "tried to get into a fight." Mr. Spurrier later told detectives that he "wanted to teach the victim a lesson." He did "not want to kill him, but he wanted to hurt him."

{¶21}  The four walked to Mr. Martin's nearby apartment.  Ms. Sladek did not enter the apartment and stayed in the parking lot.

{¶22}  Mr. Martin let them into the apartment.  During their visit, he would receive phone calls and walk in and out of the living room, sometimes out onto the living room balcony.  When Mr. Martin returned to the living room after one of those phone calls, he sat down on the couch.  Mr. Stanley told Mr. Martin he reminded him of "his father and I'm going to have to knock you out."  That was the code word or phrase the co-defendants agreed upon that signaled their attack on Mr. Martin.

{¶23}  Mr. Martin stood up, only to have Mr. Stanley push him back on the couch, where he held him down and bludgeoned him with a 20-lb dumbbell.  Mr. Spurrier told the detectives that the knife he used in the attack fell out of Mr. Joyce's bag.  He picked it up and began to stab Mr. Martin in the stomach.  He told the detectives that the first stab was an accident, but the rest were not, describing them as "[i]n, out, stab, and twist."  Mr. Joyce covered Mr. Martin's face with a pillow to mask his screams, while Mr. Stanley continued to strike Mr. Martin in the head and chest with the 20-lb dumbbell and Mr. Spurrier repeatedly stabbed Mr. Martin, who begged for his life.

{¶24}  Mr. Martin's car keys fell out his pocket, which were collected by Mr. Spurrier.  Mr. Martin managed to crawl into the corner of the room.  The three reengaged him on the floor and continued to hold him down while they hit and stabbed him.  Mr. Spurrier believed he stabbed Mr. Martin four or five times, including his throat.  He told the detectives that he enjoyed stabbing the victim because "it was getting a lot of frustration out."  He wanted to ensure Mr. Martin could not talk about this in the future.

{¶25} After the attack was completed, Mr. Stanley and Mr. Joyce left the apartment down to the first floor and waited for Mr. Spurrier to leave the apartment. Mr. Spurrier grabbed the knife and a bandana he had used to cover the knife handle. Believing there was DNA and/or fingerprints on it, he decided that both had to be discarded.

{¶26} The three, joined by Ms. Sladek, stole Mr. Martin's vehicle and began to drive. Observing police lights, they pulled over and proceeded to a Walgreens Pharmacy in Painesville, Ohio. Mr. Joyce discarded the blue bandana behind a dumpster in the parking lot. Agreeing that they needed to get out of Painesville, Mr. Spurrier, directed by Mr. Stanley, drove to Mentor. Mr. Stanley took the knife and, after wrapping a sweatshirt around the knife handle, tossed it out of the moving vehicle in Veterans Park. A ground crew later located the knife in the grass and picked it up for safekeeping. It was later identified as the Mossy Oaks knife with a three to four-inch blade that Mr. Spurrier had described to the detectives.

{¶27} After driving into Cleveland, the four eventually ended up in Niles, Ohio. Mr. Spurrier left Mr. Stanley, Mr. Joyce, and Ms. Sladek at a friend's house in Trumbull County. He kept Mr. Martin's vehicle and drove away. Several days later, he was apprehended driving the vehicle after a police chase and crash. Mr. Joyce, Mr. Stanley, and Ms. Sladek had been apprehended several days earlier.

{¶28} Mr. Martin suffered serious physical harm: the jugular vein in his neck was cut; he was stabbed in the abdomen, face, and on his left arm; his throat was sliced from the area of his Adam's apple to the left side of his face under his ear approximately 15 – 20 centimeters; one of the knife stabs lacerated his liver, several vertebrae were fractured

in his neck; and he suffered a brain bleed that would have caused his death if he had not received immediate treatment. He was on a ventilator machine for weeks after the attack. Mr. Martin was taken to Lake West Hospital and life flighted to Metro Health Hospital in Cleveland, where he stayed for several weeks before being transferred to Regency West Rehab Hospital. The state concluded its recitation of the facts by stating that "the number of stab wounds, in addition to being struck with the dumbbell indicate a purpose to kill the victim."

{¶29} Mr. Spurrier pleaded guilty to Count 1, attempted murder; Count 6, grand theft of a motor vehicle; Count 7, aggravated robbery; and Counts 11 and 12, tampering with evidence. The state expressly reserved on the record the right to bring additional homicide charges in the event the victim dies from injuries sustained in this case.

### Allied Offenses

{¶30} There was no sentencing agreement between the state and Mr. Spurrier, and both sides presented arguments as to whether the different counts were allied offenses of similar import and should be merged for purposes of sentencing. Defense counsel argued that the counts of attempted robbery, grand theft auto, and attempted murder should merge, as well as the two counts of tampering with evidence. The court ordered the parties to brief the issue prior to sentencing.

{¶31} In its brief, the state argued that Mr. Spurrier pleaded to offenses that involved separate and distinct conduct, animus, and import. Attached to the state's brief was a transcript of Mr. Spurrier's interview with detectives following his arrest. The defense argued that merger was appropriate because the offenses were inextricably linked in a short period of time.

{¶32} Following arguments from both sides at the sentencing hearing, the court found that none of the counts merge because they were dissimilar in import or significance, committed separately, and with a separate animus or motivation.

{¶33} The court explained that: "Specifically, as to the attempted murder and aggravated robbery, the attempted murder took place before and after the aggravated robbery was completed. The victim's keys were taken. All of the elements of the aggravated robbery were completed. That's looking at it in the worst case scenario. If you add in the attempt, it was well before the keys were taken. Both prior to and subsequent to the keys being taken, the defendant and his accomplices tried to kill the victim. This was done by bludgeoning them [sic] with a twenty-five pound dumbbell weight, stabbing him repeatedly, and slashing his throat. At least one of those ways of attempting to kill the victim took place before and after the aggravated robbery. This caused separate identifiable harm to the victim. Bludgeoning, stabbing, and slashing the victim's throat were not necessary to complete the crime of aggravated robbery. If a separate a separate [sic] penalty could not be imposed for the attempted murder, that would mean that the defendant was free to inflict the additional harm to the victim without additional penalty.

{¶34} "The grand theft motor vehicle occurred at a different time and different location than the attempted murder and the aggravated robbery. Tampering with evidence counts took place at different – at a different time and different location than the attempted murder, aggravated robbery, and grand theft motor vehicle.

10

{¶35} "As between the two counts of tampering with evidence, they took place at a different time and different location from each other and dealt with disposing of separate pieces of exculpatory evidence."

*Sentencing*

{¶36} The court sentenced Mr. Spurrier to an indefinite prison term of 11 to 16.5 years on Count 1 (attempted murder); 18 months on Count 6; six years on Count 7; 36 months on Count 11, and 36 months on Count 12, to run consecutive to each other, for a stated aggregate minimum prison term of 17 years and 90 months to an aggregate maximum prison term of 30 years.

{¶37} Mr. Spurrier now raises two assignments of error on appeal:

{¶38} "[1.] The trial court erred in finding that appellant was competent to stand trial and such finding was against the manifest weight of the evidence.

{¶39} "[2.] The trial court erred as a matter of law by failing to merge various counts to which appellant entered guilty pleas."

**Competent to Stand Trial**

{¶40} In his first assignment of error, Mr. Spurrier contends that the trial court erred in finding him competent to stand trial when he clearly suffered from "a shopping list of mental health difficulties" and there was evidence by way of the testimony of his expert, Dr. Afsarifard, that he was unable to assist in his own defense.

{¶41} Mr. Spurrier also argues that we should apply "something more akin" to a manifest weight of the evidence standard of review where a preponderance of the evidence is the degree of proof. He asserts the competent, credible evidence test

11

"appears to be overly deferential" when "constitutional concerns" are "called into question."

{¶42} We decline Mr. Spurrier's request that this court reconsider the appropriateness of a standard of review that is firmly established precedent. The Supreme Court of Ohio has long held that a trial court does not abuse its discretion in finding a defendant competent where its findings of competency are supported by some reliable, credible evidence. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, ¶ 33. Further, deference on these issues should be given to those "who see and hear what goes on in the court room." *Id.,* quoting *State v. Cowans*, 87 Ohio St.3d 68, 84 (1999). *See also State v. Clemmons*, 11th Dist. Trumbull No. 95-T-5305, 1996 WL 760933, *3 (Dec. 20, 1996) ("[A]n appellate court will affirm a trial court's finding of competency when the record contains some competent, credible evidence supporting such a finding").

{¶43} An abuse of discretion is a term of art, connoting judgment exercised by a court, which does not comport with reason or the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925). Stated differently, an abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶44} R.C. 2945.37(G) provides that a defendant is incompetent to stand trial if "because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense * * *." Criminal defendants are presumed to be competent to stand trial. *Id.*

12

{¶45} The test for determining whether a defendant is competent to stand trial is whether the defendant has sufficient present ability to consult with his or her attorney with a reasonable degree of rational understanding and whether the defendant has a rational and factual understanding of the proceedings against him. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 32. "Incompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock*, 28 Ohio St.3d 108, 110 (1986).

{¶46} A review of the expert reports and testimony at the hearing reveals the trial court's determination that Mr. Spurrier was competent to stand trial is supported by competent, credible evidence. All three experts agreed that Mr. Spurrier suffered from a variety of mental health issues but that he understood the nature and objectives of the proceedings against him. He indicated no confusion as to the roles of the different actors in a criminal proceeding, although he disagreed with the role of the jury.

{¶47} Despite his opinion that Mr. Spurrier "has a reasonable understanding of the factual and procedural aspect of the case," Dr. Afsarifard opined that because of "his mental illness, Mr. Spurrier is unable to effectively participate in his defense and collaborate with his attorney in a meaningful manner. He suggested Mr. Spurrier's competency could be restored by adjusting his medication regimen in conjunction with behavioral therapy and estimated it could be done within one year. He formulated his opinion based on the disorganization of Mr. Spurrier's thinking and his tangential ways of reasoning, but he also noted that Mr. Spurrier was able to understand the roles of the parties in a trial and was "able to be redirected." They did not discuss the specific

charges, but Dr. Afsarifard noted Mr. Spurrier appeared to understand the gravity of the charges.

{¶48} There is nothing in the record to suggest Mr. Spurrier did not have the ability to consult with his lawyer with a reasonable degree of rational understanding. He had a rational as well as factual understanding of the proceedings against him. Thus, the court's finding is supported by competent, credible evidence. *See State v. Berry*, 72 Ohio St.3d 354, 359 (1995). Diagnosis with a mental illness is not dispositive of a criminal defendant's competence to stand trial. *State v. Schooler*, 2018-Ohio-3295, 118 N.E.3d 467, ¶ 34 (2d Dist.).

{¶49} Mr. Spurrier's first assignment of error is without merit.

**Allied Offenses**

{¶50} In Mr. Spurrier's second assignment of error, he submits that the trial court erred in failing to merge the offenses of attempted murder, aggravated robbery, and grand theft of a motor vehicle, as well as the two counts of tampering with evidence.

{¶51} R.C. 2941.25, "Multiple counts," states:

{¶52} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶53} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶54} We review merger decisions de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 26. We must "'independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *Id.*, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶55} "[W]hen considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A)," we must consider the defendant's conduct and how the offenses were committed. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 25. "If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Id.*

{¶56} "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Id.* at ¶ 31.

### Attempted Murder, Aggravated Robbery, and Grand Theft of a Motor Vehicle

{¶57} Attempted murder, in violation of R.C. 2923.02 and R.C. 2903.02(A), provides: "[n]o person, purposely or knowingly, and when purpose or knowledge is

15

sufficient culpability for the commission of an offense, shall engage in conduct that, if successful would constitute or result in * * * the death of another * * *."

{¶58} Aggravated robbery, in violation of R.C. 2911.01(A)(1) provides: "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶59} Grand theft of a motor vehicle, in violation of R.C. 2913.02(A)(1) provides: "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * without the consent of the owner or person authorized to give consent[.]"

{¶60} A review of the evidence reveals Mr. Spurrier's convictions for attempted murder, aggravated robbery, and grand theft of a motor vehicle were not allied offenses of similar import subject to merger for purposes of sentencing since they were committed with a separate animus and caused separate, identifiable harm sufficient to support separate convictions.

{¶61} Mr. Spurrier told the detectives during his interview that he wanted to teach Mr. Martin "a lesson" because they had a physical altercation and he "had plans on beating him up. We didn't plan on stabbing him. We just planned on beating him to teach him a lesson not to hit me anymore." He also wanted to steal the victim's vehicle. He stated that he "snapped on him – when the final attack happened."

{¶62} As the incident unfolded at the victim's apartment, Mr. Spurrier began stabbing the victim in the stomach, who was seated on the couch in the living room, while

16

one of the co-defendants began bludgeoning him with a 20-lb dumbbell to the head. At some point, Mr. Martin's car keys fell out of his pocket, which Mr. Spurrier stole. Mr. Martin crawled into the corner of the room, and Mr. Spurrier continued to attack him. He told the detectives he stabbed Mr. Martin four or five times and "it felt good." He then "punched [Mr. Martin] in the head twice. I dropped the knife the first time – after the first punch – and then I came back for another hit. Each time I was like, stop fucking with me, stop hitting me, you keep your hands off Melissa [Mr. Martin's girlfriend], you know I hate that shit. I was releasing my anger at the time." Then he began stabbing the victim again.

{¶63} Mr. Spurrier told the detectives: "He begged. I remember Chris begging me to stop and I remember, Patrick, please, no, not the knife; after Loki [codefendant] said, grab the knife, he's gaining an advantage. And I said, shut up, little bitch, and stabbed him again. I did not feel any remorse at the time. I had no feelings left. * * * Like, I knew I just tried to kill somebody and I wanted to make sure that he couldn't – I remember thinking, let's make sure he can't speak about this again. So I got him in the neck and I probably did slit his throat at the time. Thinking about it now, when I used the pillow to push down to try and shut him up when he was in the corner, because he was making too much noise, yelling for help, I did drag the knife down across something. I didn't know whether it was his mouth or his chest or his throat. I did, I immediately dragged, just straight forward, and then I came around from the top of the neck and twist and pull out."

{¶64} The three met Ms. Sladek in the parking lot, where they stole Mr. Martin's vehicle.

{¶65} From a review of the facts, it is evident that Mr. Spurrier's convictions for attempted murder, aggravated robbery, and grand theft of Mr. Martin's motor vehicle were

17

committed with a separate animus and separate identifiable harm. The attempted murder was committed separate and apart from the aggravated robbery with a different purpose because the harm continued well after Mr. Martin's car keys were stolen. The purpose underlying the attempted murder was to kill the victim after having achieved the purpose of the aggravated robbery, which was to steal the car keys.

{¶66} Indeed, Mr. Spurrier, himself, stated that he wanted to teach Mr. Martin "a lesson not to hit me anymore," and wanted to make sure Mr. Martin would not be able "to talk about it." "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm results from each offense is separate and identifiable harm from the harm of the other offense." *Ruff* at ¶ 26.

{¶67} The grand theft of Mr. Martin's motor vehicle occurred at a different time and different location than the attempted murder and aggravated robbery. It also involved conduct and harm separate and apart from the aggravated robbery and attempted murder. Further, the purpose was to steal the car.

{¶68} "'Because one offense was complete before the other offense occurred, the two offenses were committed separately for purposes of R.C. 2941.25(B), notwithstanding their proximity in time and that one was committed in order to commit the other.'" *State v. Sludder*, 3d Dist. Allen No. 1-11-69, 2012-Ohio-4014, ¶ 14, quoting *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. *See also State v. Fraizer*, 58 Ohio St.2d 253, 255-256 (1979); *State v. Talley*, 18 Ohio St.3d 152, 156 (1985). To conclude otherwise would encourage those who break into buildings to steal to proceed with the theft since the offenses would merge for purposes of conviction and

sentence. The law ought to encourage criminals to stop their course of criminal conduct and to demand punishment for their further criminal acts. *Id.*

{¶69} We recently considered and rejected this argument as applied to the facts of this case in Mr. Spurrier's co-defendant's case, *State v. Stanley*, 11th Dist. Lake No. 2020-L-065, 2021-Ohio-108, ¶ 17-27. In *Stanley*, we similarly found that the trial court did not err in determining the counts of attempted murder, aggravated robbery, and grand theft of a motor vehicle were not allied offenses of separate import. *Id.* We determined that the conduct and resulting harm of aggravated robbery and grand theft of a motor vehicle constituted separate offenses; that the level of violence inflicted upon the victim and resulting injuries were far in excess of that necessary to commit aggravated robbery; and that the "purpose" was not the same. *Id.* at ¶ 22, ¶ 25.

{¶70} Mr. Spurrier's argument that these convictions are allied offenses of similar import is without merit.

### *Tampering with Evidence*

{¶71} Mr. Martin was convicted of two counts of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides: "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"

{¶72} After leaving Mr. Martin's apartment in Mr. Martin's stolen vehicle, Mr. Spurrier drove north on Richmond Street in Painesville and pulled into the parking lot behind a Walgreens Pharmacy. One of the co-defendants stated that Mr. Spurrier got out of the car and discarded the bandana behind the dumpster. They continued driving

19

toward Mentor, Ohio, and stopped to throw away the knife at Veteran's Park. It was later discovered by the grounds crew and recovered by the police.

{¶73} Under these circumstances, the two counts of tampering with the evidence concerned two separate acts in which Mr. Spurrier and his co-defendants attempted to discard two different items used in the commission of the offenses at two different locations. Thus, these counts are not allied offenses of similar import.

{¶74} Mr. Spurrier's second assignment of error is without merit.

{¶75} The judgment of the Lake County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.